No. 21-1146

———————————

# United States Court of Appeals for the First Circuit

———————————

Jonathan Monsarrat,
*Plaintiff-Appellant,*

v.

Ron Newman,
*Defendant-Appellee.*

———————————

On Appeal from the United States District Court
for the District of Massachusetts
No. 1:20-cv-10810-RGS
Before the Honorable Richard G. Stearns

## Answering Brief for Defendant-Appellee Ron Newman

———————————

Dan Booth Law LLC
Dan Booth
60 Thoreau Street #121
Concord, MA 01742
(646) 573-6596

*Counsel for Defendant-Appellee*

# Table of Contents

Table of Contents                                                                                i

Table of Authorities                                                                            iii

Jurisdictional Statement                                                                     1

Statement of the Issues                                                                      1

Statement of the Case                                                                         2

A.    Factual Background                                                                   2

B.    Procedural History                                                                    7

Summary of the Argument                                                                 9

Standard of Review                                                                             11

Argument                                                                                             12

A.    The Court should affirm the dismissal of the copyright
       infringement claim because the copy was a fair use.            12

I.     The noncommercial and transformative purposes of the
       use support a finding of fair use.                                            14

a.    The use had no commercial purpose.                                     14

b.    The use was transformative.                                                   16

c.    Bad faith conduct is not an element of the fair use analysis.   21

d.    If Newman's conduct were considered it would have little
       weight and would support a finding of fair use.                    24

II.    The factual, informational nature of the post supports a
       finding of fair use.                                                                  27

III.   The amount of the use was reasonable to serve its purpose
       and supports a finding of fair use.                                         30

| | | |
|---|---|---|
| IV. | The absence of any harmful market effect strongly supports a finding of fair use. | 32 |
| a. | Monsarrat fails to show any market harm. | 32 |
| b. | Any non-economic value of Monsarrat's copyright does not affect the fourth-factor analysis. | 35 |
| V. | The relevant factors in tandem strongly support a finding of fair use. | 39 |
| B. | The copyright dismissal should also be affirmed because Monsarrat claims no redressable injury. | 41 |
| C. | The Court should affirm the dismissal of the defamation claim because Section 230 immunizes the republication of comments by other users. | 45 |
| I. | Section 230 bars Monsarrat's defamation claims. | 46 |
| II. | Monsarrat fails to plead around Section 230. | 48 |
| a. | Monsarrat treats Newman as a publisher within the meaning of Section 230. | 48 |
| b. | Republication is within Section 230's broad immunity. | 53 |
| Conclusion | | 58 |
| Certificate of Compliance | | 59 |
| Certificate of Service | | 59 |

# Table of Authorities

## Cases

*Alston v. Spiegel*, 988 F.3d 564 (1st Cir. 2021) — 12

*Ascend Health Corp., UHP, LP v. Wells*, No. 4:12-cv-00083-BR, 2013 U.S. Dist. LEXIS 35237 (E.D.N.C. Mar. 14, 2013) — 15, 34

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) — 23

*Authors Guild, Inc. v. Google Inc.*, 954 F. Supp. 2d 282 (S.D.N.Y. 2013) — 19

*Authors Guild, Inc. v. Google Inc.*, 804 F.3d 202 (2d Cir. 2015) — 19, 35

*A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009)) — 31

*Ayyadurai v. Floor 64, Inc.*, 270 F. Supp. 3d 343 (D. Mass. 2017) — 53, 54

*Barrett v. Rosenthal*, 40 Cal. 4th 33 (Cal. 2006) — 50, 53

*Bassett v. Jensen*, 459 F. Supp. 3d 293 (D. Mass. 2020) — 34

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003) — 45, 55

*Bell v. Moawad Grp., LLC*, 326 F. Supp. 3d 918 (D. Ariz. 2018) — 28, 30

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006) — 18

*Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006) — 35

*Blumenthal v. Drudge*, 992 F. Supp. 44 (D.D.C. 1998) — 50

*Bond v. Blum*, 317 F.3d 385 (4th Cir. 2003) — 34

*Bouchat v. Baltimore Ravens Ltd. P'ship,*
619 F.3d 301 (4th Cir. 2010) ............................................ 15, 33

*Bouchat v. Bon-Ton Dep't Stores, Inc.,*
506 F.3d 31 (4th Cir. 2007) ............................................ 43

*Brown v. Netflix, Inc.,* No. 20-2007,
2021 U.S. App. LEXIS 14673 (2d Cir. May 18, 2021) ............ 13

*Callahan v. Ancestry.com, Inc.,* No. 20-cv-08437-LB,
2021 U.S. Dist. LEXIS 112036 (N.D. Cal. June 15, 2021) ...... 57

*Cambridge Univ. Press v. Patton,*
769 F.3d 1232 (11th Cir. 2014) ...................................... 35

*Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569 (1994) .... *passim*

*Caner v. Autry,* 16 F. Supp. 3d 689 (W.D. Va. 2014) ........ 24, 26, 27

*Casillas v. Madison Ave. Assocs.,* 926 F.3d 329 (7th Cir. 2019) ... 45

*Charles Novins, Esq., P.C. v. Cannon,* Civ. No. 09-5354,
2010 U.S. Dist. LEXIS 41147 (D.N.J. Apr. 27, 2010) .......... 51

*Chicago Lawyers' Comm. for Civ. Rights Under Law, Inc.
v. Craigslist, Inc.,* 519 F.3d 666 (7th Cir. 2008) .......... 53

*Compaq Computer Corp. v. Ergonome Inc.,*
387 F.3d 403 (5th Cir. 2004) ........................................ 29

*Comyack v. Giannella,* No. SOM L 1356-19,
2020 N.J. Super. LEXIS 49 (N.J. Super. Ct. Apr. 21, 2020) ... 54

*Denison v. Larkin,* 64 F. Supp. 3d 1127 (N.D. Ill. 2014) ...... 34

*Derek Andrew, Inc. v. Poof Apparel Corp.,*
528 F.3d 696 (9th Cir. 2008) ........................................ 43

*Doe v. Backpage.com, LLC,*
817 F.3d 12 (1st Cir. 2016) ...................................... 42, 44, 46, 49, 51

*Doe v. Friendfinder Network, Inc.*,
540 F. Supp. 2d 28 (D.N.H. 2008) — 53, 54, 57

*Fair Hous. Council of San Fernando Valley v.
Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) — 51

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) — 29

*Fischer v. Forrest*, 968 F.3d 216 (2d Cir. 2020) — 44

*Folsom v. Marsh*, 9 F. Cas. 342,
F. Cas. No. 4,901 (C.C.D. Mass. 1841) — 17, 29

*Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019) — 52

*Foss v. Marvic Inc.*, 994 F.3d 57 (1st Cir. 2021) — 11

*Fyk v. Facebook, Inc.*, 808 Fed. Appx. 597 (9th Cir. 2020) — 55

*Germanowski v. Harris*, 854 F.3d 68 (1st Cir. 2017) — 11

*Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183,
209 L. Ed. 2d 311 (2021) — *passim*

*Harper & Row, Publ'rs v. Nation Enters.*,
471 U.S. 539 (1985) — *passim*

*Hustler Magazine, Inc. v. Moral Majority, Inc.*,
796 F.2d 1148 (9th Cir. 1986) — 18

*In re DMCA Subpoena to Reddit, Inc.*,
441 F. Supp. 3d 875, 885 (C.D. Cal. 2020) — 30

*Infinity Broad. Corp. v. Kirkwood*,
150 F.3d 104 (2d Cir. 1998) — 36

*Jones v. Dirty World Entm't Recordings LLC*,
755 F.3d 398 (6th Cir. 2014) — 52, 54, 57

*Jorge v. Rumsfeld*, 404 F.3d 556 (1st Cir. 2005) — 11

*Katz v. Google Inc.*, 802 F.3d 1178 (11th Cir. 2015) — 14, 34, 38

*Kimzey v. Yelp!, Inc.*, 836 F.3d 1263 (9th Cir. 2016) — 52, 55, 56, 57

*Latin Am. Music Co. v. Spanish Broad. Sys., Inc.*,
866 F. Supp. 780 (S.D.N.Y. 1994) — 44

*Leadsinger, Inc. v. BMG Music Publ'g*,
512 F.3d 522 (9th Cir. 2008) — 28

*Leibovitz v. Paramount Pictures Corp.*,
137 F.3d 109 (2d Cir. 1998) — 34

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
387 F.3d 522 (6th Cir. 2004) — 37

*Love v. New York City*, No. 88 Civ. 7562,
1989 U.S. Dist. LEXIS 13740 (S.D.N.Y. Nov. 20, 1989) — 42

*Marano v. Metro. Museum of Art*,
844 Fed. Appx. 436 (2d Cir. 2021) — 13, 15, 30, 31

*Mathieson v. Associated Press*, No. 90 Civ. 6945,
1992 U.S. Dist. LEXIS 9269 (S.D.N.Y. June 25, 1992) — 29

*Maxtone-Graham v. Burtchaell*,
803 F.2d 1253 (2d Cir. 1986) — 26

*McKee v. Cosby*, 874 F.3d 54 (1st Cir. 2017) — 11

*Monsarrat v. Rosenbaum*, No. 11-cv-10248-DPW,
Order of Default Judgment (D. Mass. Feb. 1, 2012) — 4, 43

*Monsarrat v. Zaiger*, 286 F. Supp. 3d 253 (D. Mass. 2017) — 5, 6, 11

*Murray Hill Publ'ns, Inc. v. ABC Commc'ns, Inc.*,
264 F.3d 622 (6th Cir. 2001) — 30

*NAGE/Int'l Bhd. of Police Officers v. BUCI TV, Inc.*,
118 F. Supp. 2d 126 (D. Mass. 2000) — 23, 28, 38

*Nail v. Schrauben*, No. 1:15-cv-177,
2016 U.S. Dist. LEXIS 17987 (W.D. Mich. Jan. 22, 2016) ........ 55

*New Era Publ'ns Int'l, ApS v. Carol Publ'g Grp*,
904 F.2d 152 (2d Cir. 1990) ........ 24, 26, 32

*Núñez v. Caribbean Int'l News Corp.*,
235 F.3d 18 (1st Cir. 2000) ........ *passim*

*NXIVM Corp. v. Ross Inst.*, 364 F.3d 471 (2d Cir. 2004) ........ 25

*Peer Int'l Corp. v. Latin Am. Music Corp.*,
161 F. Supp. 2d 38 (D.P.R. 2001) ........ 42

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) ........ 31

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
602 F.3d 57 (2d Cir. 2010) ........ 14

*Peterman v. Republican Nat'l Comm.*,
369 F. Supp. 3d 1053 (D. Mont. 2019) ........ 38

*Red Label Music Publ'g, Inc. v. Chila Prods.*,
388 F. Supp. 3d 975 (N.D. Ill. 2019) ........ 18

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs.*,
923 F. Supp. 1231 (N.D. Cal. 1995) ........ 24

*Roca Labs, Inc. v. Consumer Op. Corp.*,
140 F. Supp. 3d 1311 (M.D. Fla. 2015) ........ 54

*Rubin v. Boston Magazine Co.*, 645 F.2d 80 (1st Cir. 1981) ........ 12, 37

*Rubin v. Brooks/Cole Publ'g Co.*,
836 F. Supp. 909 (D. Mass. 1993) ........ 33

*Savage v. Council on American-Islamic Relations, Inc.*,
No. C 07-6076 SI, 2008 U.S. Dist. LEXIS 60545
(N.D. Cal. July 25, 2008) ........ 22, 25

*Small Justice LLC v. Xcentric Ventures LLC*,
873 F.3d 313 (1st Cir. 2017)                      8, 46, 52, 54, 57

*Soc'y of the Holy Transfiguration Monastery, Inc.
v. Gregory*, 689 F.3d 29 (1st Cir. 2012)               28, 36

*Sony Corp. v. Univ. City Studios, Inc.*,
464 U.S. 417 (1984)                      17, 30, 33, 37, 40

*Stern v. Does*, 978 F. Supp. 2d 1031 (C.D. Cal. 2011)        18

*Sullivan v. Flora, Inc.*, 936 F.3d 562 (7th Cir. 2019)         42

*Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194 (4th Cir. 1998)    19, 32

*Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.*,
553 F. Supp. 2d 680 (N.D. Tex. 2008)                  26

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg, L.P.*,
756 F.3d 73 (2d Cir. 2014)                       31

*TCA Television Corp. v. McCollum*, 839 F.3d 168
(2d Cir. 2016)                              13

*Time Inc. v. Bernard Geis Associates*, 293 F. Supp. 130
(S.D.N.Y. 1968)                             22

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190,
210 L. Ed. 2d 568 (2021)                       45

*Univ. Commc'n Sys., Inc. v. Lycos, Inc.*,
478 F.3d 413 (1st Cir. 2007)                 45, 46, 48, 50, 51

*Ventura Content, Ltd. v. Motherless, Inc.*,
885 F.3d 597 (9th Cir. 2018)                     41

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
342 F.3d 191 (3d Cir. 2003)                      37

*Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562 (1977)     24

*Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997)     45, 48, 49

**Statutes and Rules**

| | |
|---|---|
| 17 U.S.C. § 101 | 1 |
| 17 U.S.C. § 104A(d)(3)(B) | 39 |
| 17 U.S.C. § 104A(h)(6) | 39 |
| 17 U.S.C. § 106 | 37, 38 |
| 17 U.S.C. § 107 | *passim* |
| 17 U.S.C. § 107(1) | 14 |
| 17 U.S.C. § 107(2) | 27 |
| 17 U.S.C. § 107(3) | 30 |
| 17 U.S.C. § 107(4) | 35, 39 |
| 17 U.S.C. § 108 | 19 |
| 17 U.S.C. § 108(f)(2) | 38 |
| 17 U.S.C. § 112(a)(1)(B) | 19 |
| 17 U.S.C. § 112(e)(8) | 38 |
| 17 U.S.C. § 117(a)(2) | 19 |
| 17 U.S.C. § 411(a) | 4 |
| 17 U.S.C. § 412 | 42, 43 |
| 17 U.S.C. § 412(2) | 43 |
| 17 U.S.C. § 504(b) | 15 |
| 17 U.S.C. § 504(c)(1) | 44 |
| 17 U.S.C. § 505 | 8 |
| 17 U.S.C. § 512(c)(3) | 41 |

17 U.S.C. § 602(a)(3)(C)                                              19

17 U.S.C. § 1201(a)(1)(C)(ii)                                         19

17 U.S.C. § 1201(d)                                                   19

17 U.S.C. § 1203(c)(5)(B)                                             19

28 U.S.C. § 1291                                                       1

28 U.S.C. § 1338(a)                                                    1

28 U.S.C. § 1367(a)                                                    1

47 U.S.C. § 230                                                  *passim*

47 U.S.C. § 230(c)                                                    48

47 U.S.C. § 230(c)(1)                                            *passim*

47 U.S.C. § 230(c)(2)                                                 51

47 U.S.C. § 230(f)(2)                                                 47

47 U.S.C. § 230(f)(3)                                          47, 51, 54

Fed. R. Civ. P. 12(b)(6)                                           7, 46

**Other Authorities**

Horace G. Ball, *The Law of Copyright and Literary Property*
260 (1944)                                                           12

Simon J. Frankel & Matt Kellogg, *Bad Faith and Fair Use*,
60 J. Copyright Soc'y 1 (Fall 2012)                                  23

H.R. Rep. No. 94-1476 (1976)                                     19, 35

Pierre N. Leval, *Toward a Fair Use Standard*,
103 Harv. L. Rev. 1105 (1990)                                  *passim*

Melville B. Nimmer & David Nimmer,
2 *Nimmer on Copyright* § 7.16[C][1]                                    42

Melville B. Nimmer & David Nimmer,
4 *Nimmer on Copyright* § 13.05[A][1][c]                                15

Melville B. Nimmer & David Nimmer,
4 *Nimmer on Copyright* § 13.05[A][2][a]                                28

William F. Patry, *Patry on Fair Use* § 6.6                             33

William F. Patry, *Patry on Fair Use* § 10.13                          22

William F. Patry and Shira Perlmutter, *Fair Use
Misconstrued: Profit, Presumptions, and Parody*,
11 Cardozo Arts & L.J. 667 (1993)                                      35

Bill Shaner, *The Community Memory of a Neighborhood:
Davis Square's LiveJournal*, Scout Somerville (Nov. 14, 2015)           2

Cathay Y.N. Smith, *Copyright Silencing*,
106 Cornell L. Rev. Online 71 (2021)                                   41

Ned Snow, *Fair Use as a Matter of Law*,
89 Denv. U.L. Rev. 1 (2011)                                            38

U.S. Constitution, Article III                                         44

## Jurisdictional Statement

Jonathan Monsarrat ("Monsarrat") initiated this action in the District of Massachusetts. The District Court had subject matter jurisdiction under 28 U.S.C. § 1338(a) because he alleged a violation of the Copyright Act, 17 U.S.C. § 101 *et seq*., and supplemental jurisdiction over his state-law defamation claims because they were part of the same case or controversy under 28 U.S.C. § 1367(a). DE 1 ¶ 4.[1]

This Court has jurisdiction under 28 U.S.C. § 1291 because the District Court's January 21, 2021 Memorandum and Order dismissing both claims, and its separate Judgment that same day granting Ron Newman's ("Newman") motion to dismiss, were final decisions. Addendum ("Add.") 1-13, Appendix ("App.") 18-19. Monsarrat timely filed a notice of appeal on February 19, 2021. App. 127.

## Statement of the Issues

(1)   Does Newman's 2017 reproduction of Monsarrat's final 2010 Davis Square forum comment constitute fair use?

(2)   Does Section 230 immunity protect Newman's reproduction of Davis Square forum comments written by third parties?

---

[1] Citations in the form "DE _" refer to record entries on the District Court docket.

## Statement of the Case

This appeal arises from Monsarrat's second lawsuit against Newman, filed in the United States District Court for the District of Massachusetts on April 28, 2020, raising copyright infringement and defamation claims over social media comments first posted between 2009 and 2013, and from the District Court's order granting Newman's motion to dismiss. App. 1, 18-19, 31-50, Add. 1-12.

### A.    Factual Background.

Since 2002, members of Somerville's Davis Square community have interacted online in "a forum where people discuss politics, culture, art, news, the socioeconomics of the neighborhood, the development," and more. Bill Shaner, *The Community Memory of a Neighborhood: Davis Square's LiveJournal*, Scout Somerville (Nov. 14, 2015), https://scoutsomerville.com/davis-square-livejournal/. The forum initially operated at https://davis-square.livejournal.com via the hosting service LiveJournal. *Id.*; App. 7-8 ¶¶ 7-8. Newman, one of the Davis Square forum's four moderators since 2007, has called it "a community memory system." *Id.*; App. 8 ¶ 9. Popular forum topics include "art" (447 threads), "events" (1,389), "local businesses" (792), "local government" (621), and "restaurants" (569).

2

DE 16-15 pp. 48-49. Forum threads in 2008 and 2009 discussed local displays of Monsarrat's artworks. *Id.* pp. 38-39, 45-47; DE 16-4.

On January 29, 2010, the Somerville police broke up a party at Monsarrat's residence and arrested him. DE 16-19. News of the arrest spread online on February 4, 2010, from the *Somerville Journal*'s Wicked Local Somerville blog to social media, including the Davis Square forum. DE 16-20, DE 16-1 ¶¶ 34, 43-51; App. 8 ¶ 8. One thread in that forum garnered 526 comments over three days, including 80 posted by Monsarrat under his LiveJournal username make_you_laugh. DE 16-3. In the last of those 80 comments, posted February 6, 2010, entitled "Violation of LiveJournal abuse policy" ("Violation"), Monsarrat demanded that forum users remove their comments and threatened to pursue claims that they had violated LiveJournal policy:



**Violation of LiveJournal abuse policies**
 make_you_laugh
February 6 2010, 21:03:40 UTC

LiveJournal's abuse policies are at http://www.livejournal.com/abuse/policy.bml

Under the section "Harassment", it says that "If a user makes a statement which encourages or incites others to harass another person in any way, access to that content will be disabled. This can also extend to entries in which harassment has not been explicitly called for, but is implied, at the discretion of the Abuse Prevention Team."

This is it. I'll give everyone here until Monday at 12pm to remove your comments from this board. At that point, I'm collecting every single one of them. I have already filed an abuse report with LiveJournal but won't call them until Monday at 12pm.

DE 16-3 p. 95, App. 22, Add. 3. After his "threats made to the community," the forum moderators "permanently froze[]" the thread that day, automatically blocking further replies. App. 21, DE 16-3 p. 1.

The lawsuits began a year later. To facilitate litigation, *see* 17 U.S.C. § 411(a), Monsarrat applied to register the copyright for his Violation comment on February 15, 2011. *See* DE 34 pp. 11-12. He filed suit against another LiveJournal user that same day, alleging copyright infringement of Violation and other texts and photographs, and obtained a default judgment in that case in 2012. *Id.*; *Monsarrat v. Rosenbaum*, No. 11-cv-10248-DPW, Order of Default Judgment (D. Mass. Feb. 1, 2012). The copyright registration for Violation issued on August 16, 2012. Appellant's Brief ("Br.") 13, 48.

On February 4, 2013, Monsarrat filed suit in Massachusetts state court against Newman, former *Somerville Journal* blogger Deb Filcman, and 100 Doe defendants. DE 16-6. His April 30, 2013 amended complaint alleged defamation and other claims, targeting dozens of comments from the 526-comment thread, two other Davis Square forum threads, and elsewhere online. DE 16-1. In letters to putative Doe defendants in May 2013, Monsarrat announced, "I am suing LiveJournal forum moderator Ron Newman for $5,500,000 for

defamation," and demanded that they remove their online comments or be named as parties. *See* DE 34 p. 2. Forum users rallied to support and defend Newman and their free speech. *See* DE 16-11, DE 16-15 pp. 2-3, 24, 27-31. Newman sent Monsarrat a letter explaining that the claims were not actionable because Newman's accused comments had no defamatory meaning, and because 47 U.S.C. § 230, Section 230 of the Communications Decency Act of 1996 ("Section 230" or "CDA"), immunized Newman from any claims regarding third-party comments. DE 16-21 pp. 4-10. Newman prepared a motion to dismiss; before he was due to file it, Monsarrat voluntarily dismissed all claims with prejudice on June 7, 2013. DE 16-14 pp. 1-2, DE 16-6.

On March 2, 2017, Monsarrat filed a lawsuit against the owner of EncyclopediaDramatica.com, alleging copyright infringements on that site's page about "jonmon" (Monsarrat's nickname). App. 9-13 ¶¶ 14, 26; *see* DE 40-2 p. 12. The claims were dismissed as time-barred. *Monsarrat v. Zaiger*, 286 F. Supp. 3d 253, 257 (D. Mass. 2017).

LiveJournal, the Davis Square forum's original hosting service, modified its terms of service in April 2017, making the service subject to Russian law and potentially political censorship. App. 7-8 ¶¶ 7-8. "The new terms prompted wide concern from users who believed that

their content would now be targeted under Russian censorship policies, including the country's 'gay propaganda' law." DE 16-16 p. 14. The Davis Square forum moderators announced that beginning May 1, 2017, the forum would move to the Dreamwidth hosting service at https://davis-square.dreamwidth.org. *See* https://davis-square.livejournal.com. To facilitate the hosting switch and preserve older comments, Newman made back-up copies of all of the forum's comment threads on LiveJournal and reproduced them via Dreamwidth. *See id.*; App. 9-10 ¶¶ 16-20; Br. 14; DE 40-2 p. 12.

To justify suing Newman again in 2020, Monsarrat posited that changing the forum's hosting service in 2017 made Newman liable as the "publisher" of allegedly defamatory forum comments by third parties. App. 9-10 ¶¶ 16, 20. Under Monsarrat's theory of the case, Newman thereby "took ownership" of "speech originally created many years before by numerous anonymous speakers," and became "the legally responsible information content provider" of that third-party speech, not entitled to Section 230 immunity. App. 11 ¶¶ 23-25.

Monsarrat presented his theory in a March 19, 2020 demand letter to Newman, six weeks before filing suit. App. 14 ¶ 35, DE 40-2 pp. 2-7. He mentioned copyright only when discussing *Zaiger*. *Id.*

Newman responded on March 30, 2020, quoting cases that hold that Section 230 precludes defamation liability based on the republication of third-party posts. App. 14 ¶¶ 36-37, DE 40-2 pp. 10-12.

**B.    Procedural History.**

Monsarrat initiated this action against Newman on April 28, 2020. App. 1. Monsarrat filed his First Amended Complaint ("FAC") on September 29, 2020. App. 2. He alleged copyright infringement over Violation, his final 2010 entry in the 526-comment thread. App. 15 ¶¶ 45-46, App. 22, 25, Add. 3. Monsarrat also alleged defamation based on eight of the third-party comments complained of in his 2013 lawsuit and a ninth comment written on April 30, 2013 in response to that earlier case. App. 10-11 ¶¶ 21(i)-(ix), App. 43, DE 16-11 p. 10.

Newman moved to dismiss under Fed. R. Civ. P. 12(b)(6) on November 30, 2020. App. 18-20, 31-50. He contended that reproducing Violation was a fair use, not an infringement, and that Section 230 immunized republication of the third-party comments. *Id.* Monsarrat filed an opposition on December 14, 2020. App. 66-85.

The District Court dismissed for failure to state a claim and entered judgment for Newman on January 21, 2021. Add. 1-13. It found that "the FAC establishe[d] Newman's entitlement to a fair use

7

defense as a matter of law." Add. 4. It further found that Section 230 immunity applied, and that Monsarrat's republication theory was "no basis on which the court can impose liability." Add. 10-11.

Monsarrat noticed this appeal on February 19, 2021. App. 127.

As the prevailing party under the Copyright Act, Newman moved for an award of attorneys' fees pursuant to 17 U.S.C. § 505. DE 33. The District Court granted the motion in part, awarding half the total requested. DE 41. It found "Monsarrat's claims were, by any objective measure, flimsy at best." *Id.* p. 2. "[T]he copyright claim at issue appear[ed] to be little more than a gratuitous frill appended to the Complaint to lever the case into the federal court." *Id.* And "as the individual who originally posted [Violation] on LiveJournal, Monsarrat was free at any time to remove it from the Dreamwidth website[.]" *Id.* p. 3. As for the defamation claims, as " Monsarrat's counsel had litigated the *Small Justice* case ... [he] could not have been unaware that § 230 would cover the republication alleged here." *Id.* pp. 3-4 (*citing Small Justice LLC v. Xcentric Ventures LLC*, 873 F.3d 313 (1st Cir. 2017)); *see* DE 40-2 p. 14. Monsarrat did not appeal from the order awarding fees or contest any of its findings. App. 5.

## Summary of the Argument

The Court should affirm the dismissal because Monsarrat had no basis to proceed on either claim. Monsarrat's FAC, documents incorporated by reference, and concessions in his District Court and appellate briefs establish Newman's entitlement to his defenses. All relevant fair use factors weigh in favor of the copy of Violation, and republishing third-party comments is immune under Section 230.

The copyright claim was dismissed because the four factors identified in 17 U.S.C. § 107 all support fair use. Under the first factor, Newman had no commercial purpose for reproducing Violation via Dreamwidth along with thousands of other Davis Square forum posts, which generate no advertising revenue. The use also had distinct, transformative purposes. Monsarrat wrote Violation to demand that forum users purge their comments. Preserving the demand and the other comments for posterity showed that they had not capitulated. After Monsarrat's first suit over the comments, that documentation served a historic, archival purpose. His aspersions of bad faith are neither a requisite fair use consideration nor material in this case.

The second factor favors fair use because the nature of Violation, quoting LiveJournal policy and conveying Monsarrat's

demand, was primarily factual and informational. The third factor
favors fair use because reproducing all of Violation was consistent
with Newman's historical, preservationist purposes. Under the fourth
factor, because the use was noncommercial, Monsarrat has the
burden to prove that significant market harm is likely, yet he
recognizes that Violation has no plausible market whatsoever.

Fair use strongly supports dismissal of the infringement claim.
The Court may also affirm because the record shows that Monsarrat
is ineligible for statutory damages and there are no recoverable actual
damages or profits, so he has no redressable copyright injury.

The defamation claim was also properly dismissed. Section 230
immunizes internet users and service providers from civil claims,
including defamation, that would treat them "as the publisher or
speaker of any information provided by another information content
provider." 47 U.S.C. § 230(c)(1). All three elements of the statutory
immunity are satisfied. Monsarrat alleged that Newman is a "user of
an interactive computer service." *Id.* His allegation that third parties
wrote and posted the allegedly defamatory comments makes them the
"information content provider[s]" of those comments, not Newman.

*Id.* And the defamation claim expressly sought to hold Newman liable "as the publisher" of that third-party information. *Id.*

As the District Court found, Monsarrat failed to plausibly allege that Newman had participated in the creation or development of those forum posts on LiveJournal. Newman cannot be treated as their publisher in the reconstituted forum on Dreamwidth. Section 230 shields the republication of content generated wholly by third parties.

### Standard of Review

Dismissals for failure to state claims of copyright infringement and defamation are reviewed *de novo*. *Foss v. Marvic Inc.*, 994 F.3d 57, 62 (1st Cir. 2021); *McKee v. Cosby*, 874 F.3d 54, 59 (1st Cir. 2017).

"In undertaking this review, we ask whether the well-pleaded factual allegations, viewed in the light most favorable to the plaintiff, state a claim for which relief can be granted." *Germanowski v. Harris*, 854 F.3d 68, 71 (1st Cir. 2017). "We augment those facts with facts extractable from documentation annexed to or incorporated by reference in the complaint and matters susceptible to judicial notice." *Jorge v. Rumsfeld*, 404 F.3d 556, 559 (1st Cir. 2005). The review may also encompass "documents the authenticity of which are not disputed by the parties." *Zaiger*, 286 F. Supp. 3d at 256. The Court

11

"may affirm an order of dismissal on any ground made manifest by the record." *Alston v. Spiegel*, 988 F.3d 564, 571 (1st Cir. 2021).

## Argument

### A.    The Court should affirm the dismissal of the copyright infringement claim because the copy was a fair use.

The District Court correctly found, "drawing all reasonable inferences in Monsarrat's favor, … that the FAC establishes Newman's entitlement to a fair use defense as a matter of law." Add. 4. It properly applied the factors that guide fair use analysis:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.
>
> *Id.* (*quoting* 17 U.S.C. § 107).

"'Fair use' is a 'privilege in others than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner.'" *Rubin v. Boston Magazine Co.*, 645 F.2d 80, 83 (1st Cir. 1981) (*quoting* Horace G. Ball*, The Law of Copyright and Literary Property* 260

12

(1944)). "[I]ts basic purpose [is] providing a context-based check that can help to keep a copyright monopoly within its lawful bounds." *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1198, 209 L. Ed. 2d 311 (2021).

"Fair use is a mixed question of law and fact." *Harper & Row, Publ'rs v. Nation Enters.*, 471 U.S. 539, 560 (1985). Fair use can be determined when the facts are "sufficient to evaluate each of the statutory factors." *Id.* "[T]he ultimate question whether those facts showed a 'fair use' is a legal question for judges to decide *de novo*." *Google*, 141 S. Ct. at 1199. The "right of trial by jury'" does not include "the right to have a jury resolve a fair use defense." *Id.* at 1200.

"Fair use may be 'so clearly established by a complaint as to support dismissal of a copyright infringement claim.'" *Marano v. Metro. Museum of Art*, 844 Fed. Appx. 436, 438 (2d Cir. 2021) (*quoting TCA Television Corp. v. McCollum*, 839 F.3d 168, 178 (2d Cir. 2016)). "When, as here, the copyrighted and secondary works are incorporated by reference into the pleadings, 'the works themselves supersede and control contrary descriptions of them, including any contrary allegations, conclusions or descriptions of the works contained in the pleadings.'" *Brown v. Netflix, Inc.*, No. 20-2007,

13

2021 U.S. App. LEXIS 14673, *5-6 (2d Cir. May 18, 2021) (*quoting*

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57,

64 (2d Cir. 2010)). Those materials establish the fair use defense.

## I.    The noncommercial and transformative purposes of the use support a finding of fair use.

"Factor One is the soul of fair use." Pierre N. Leval, *Toward a*

*Fair Use Standard*, 103 Harv. L. Rev. 1105, 1116 (1990) ("Leval"). It

entails considerations of whether the use served a "commercial"

purpose, and whether it was "transformative." 17 U.S.C. § 107(1);

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994); *see*

*Katz v. Google Inc.*, 802 F.3d 1178, 1182 (11th Cir. 2015). It weighs

strongly in favor of fair use because the use was not commercial and it

had transformative, historical purposes. Bad faith is not a material

issue under this factor, and it is not well pleaded; if it were, it would

not outweigh the noncommercial, transformative aspects of the use.

## a.    The use had no commercial purpose.

Monsarrat does not dispute that reproducing Violation in the

Davis Square discussion forum on Dreamwidth was not commercial.

Access to the forum is free. *See* https://davis-square.livejournal.com.

As found below, "there is no allegation that the post itself was used to

promote traffic to the Dreamwidth community." Add. 6 n. 2. He did

not allege that Newman reaped any "profits" recoverable under 17 U.S.C. § 504(b). App. 16. Materials incorporated by reference in the FAC show that Newman "could not have profited even indirectly because there is no advertising on the [Dreamwidth] page." App. 37; *see* App. 24-30, App. 9 ¶ 18, DE 16-17 pp. 2-3.

 "'[I]t is appropriate to evaluate [the use's] commercial status on its own terms.'" *Bouchat v. Baltimore Ravens Ltd. P'ship*, 619 F.3d 301, 314 (4th Cir. 2010) (*quoting* Melville B. Nimmer & David Nimmer, 4 *Nimmer on Copyright* § 13.05[A][1][c]). Courts evaluating fair use can find noncommercial use upon a motion to dismiss. *See Marano*, 844 Fed. Appx. at 438-39; *Ascend Health Corp. v. Wells*, No. 4:12-cv-00083-BR, 2013 U.S. Dist. LEXIS 35237, *43 (E.D.N.C. Mar. 14, 2013) ("Nothing indicates that [defendant] charges anyone to view her blogs or that she otherwise profits in any way from her posting of [plaintiff's] images.").

Under the first factor, "the crux of the profit/nonprofit distinction is not whether the sole motive of the use is economic gain but whether the user stands to profit from the exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562. Newman had no economic motive and

Violation has no "customary price"; Monsarrat posted it for free and does not claim that anyone ever paid him to view or reprint it. *See* App. 38. With no basis to dispute "that Newman realized no economic benefit," Monsarrat contends only that noncommercial use is not by itself dispositive or presumptively fair. App. 80-81, Br. 53. But "[t]here is no doubt that a finding that copying was not commercial in nature tips the scales in favor of fair use." *Google*, 141 S. Ct. at 1204.

**b.    The use was transformative.**

The Dreamwidth copy of Violation had a transformative purpose. The District Court found "no plausible argument that the challenged republication effectuated the same purpose as the underlying post." DE 41 p. 3. "[I]t is clear from the face of the FAC []and from the plain text of the post and its reproduction … that Newman did not publish the copyrighted post for the same purposes for which Monsarrat initially created it." Add. 4-5. Monsarrat offers no reason to disturb those findings.

*Campbell* adopted Judge Leval's insights and made transformativeness a linchpin of the first factor analysis, asking "whether the new work merely 'supersede[s] the objects' of the original creation … or instead adds something new, with a further

16

purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.'" 510 U.S. at 579 (*quoting Folsom v. Marsh*, 9 F. Cas. 342, 348, F. Cas. No. 4,901 (C.C.D. Mass. 1841) *and* Leval 1111). "[S]uch transformative use is not absolutely necessary for a finding of fair use," but "the more 'transformative' the new work, the less will be the significance of other factors ... that may weigh against a finding of fair use." *Id.* (*citing Sony Corp. v. Univ. City Studios, Inc.*, 464 U.S. 417, 455 n. 40 (1984)).

The District Court recognized Monsarrat's undisputed purpose for writing Violation: "to highlight LiveJournal's harassment policy and demand deletion of other posts on the community website which he viewed as violative." Add. 5. He demanded the deletions by Monday, February 8, 2010. App. 22. Reproducing a copy, seven years after the deadline passed, had an inherently distinct purpose and function. App. 25. It retained the demanding message only as a relic. On Dreamwidth, the threat to report users to LiveJournal's Abuse Prevention team was defanged. The moderators noted Monsarrat's "threats made to the community" in 2010. *Id.* Reproducing Violation showed that the community was not cowed. It "conveyed the fact of

the post rather than its underlying message ... [and] thus had a substantially different purpose than the post itself." *Stern v. Does*, 978 F. Supp. 2d 1031, 1045 (C.D. Cal. 2011), *aff'd on other grounds sub nom. Stern v. Weinstein*, 512 Fed. Appx. 701 (9th Cir. 2013). *See also Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1153 (9th Cir. 1986) (Reverend Falwell, mocked in an adult magazine parody, had distinct purposes when sending copies of the parody to his followers).

Monsarrat threatened Newman and other Davis Square forum users over their posts with Violation, and sued him over those posts three years later. When Newman took steps to keep the forum intact with a more hospitable hosting service, reproducing the threat did not renew it. Preserving the community memory of the neighborhood served transformative, archival, and autobiographical purposes. *See Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir. 2006) (use of concert posters in a biography of the Grateful Dead, "as historical artifacts to document and represent the actual occurrence of Grateful Dead concert events" did not serve the original posters' purposes of "artistic expression and promotion"); *Red Label Music Publ'g, Inc. v. Chila Prods.*, 388 F. Supp. 3d 975, 984-85 (N.D.

Ill. 2019) (when used "as part of the historical record" in a documentary about the Chicago Bears, "[t]he *Super Bowl Shuffle* is not serving its original function of entertainment").

The Dreamwidth reproduction was "solely for historical and preservationist purposes," as the District Court found. Add. 5. Copyright law recognizes those goals as beneficial. Several Copyright Act provisions highlight the importance of archival preservation. *See* 17 U.S.C. §§ 108, 112(a)(1)(B), 117(a)(2), 602(a)(3)(C), 1201(a)(1)(C)(ii), 1201(d), 1203(c)(5)(B). Its legislative history cites the preservation of films shot on volatile nitrate stock as a fair use: "the making of duplicate copies for purposes of archival preservation certainly falls within the scope of 'fair use.'" H.R. Rep. No. 94-1476, p. 73 (1976). Similarly, making copies of a "fragile, seventy-year-old manuscript," to prevent damage and allow authentication, "was non-commercial and nonexploitative" and "unquestionably served the 'public benefit' and 'the development of art.'" *Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194, 203 (4th Cir. 1998). Online preservation is also favored. *See Authors Guild, Inc. v. Google Inc.*, 954 F. Supp. 2d 282, 288 (S.D.N.Y. 2013) ("Google Books helps to preserve books and give them new life"), *aff'd*, 804 F.3d 202 (2d Cir. 2015).

Monsarrat contends that Newman cannot be found to have had historical and preservationist purposes because he alleged Newman's purpose was to defame. Br. 10, 53-54, 56. But Newman's purposes were necessarily broader than any alleged defamation. Monsarrat recognizes that "Newman made copies of *each and every one* of the so-called discussion threads on the LiveJournal.com website," not just Violation and the allegedly defamatory comments, and then "determined to republish his compilation of those copies on the Dreamwidth.com website." Br. 14 (emphasis added), 10; *accord* DE 40 pp. 2-3, Add. 2. Newman copied thousands of forum threads under the specter of censorship on LiveJournal; just 44 are tagged as about "jonmon." DE 16-15. A benign purpose to preserve history for the Davis Square community, including the history of Monsarrat's threats and lawsuits, is facially evident.

Monsarrat further argues that "this purported preservationist purpose is belied by the record fact that all the original content remains preserved on the LiveJournal.com website." Br. 54. No fair use case holds that the purpose to preserve a copy, or any other transformative purpose, requires the removal or destruction of the original work. And the record belies Monsarrat's argument. The FAC

20

alleged LiveJournal's speech-restrictive policy changes in 2017, which endangered the cohesion of the Davis Square forum and spurred the moderators to preserve it elsewhere. App. 7-8 ¶ 7 ("on April 4, 2017 LiveJournal changed its terms of service"); App. 10 ¶¶ 19-20 (Dreamwidth "is open[] to content which after April 4, 2017 is no longer welcome on LiveJournal"); App. 15 ¶ 46 (alleging Newman published copy of Violation on Dreamwidth on or shortly after April 30, 2017); *see also* DE 16-16 p. 14. Newman reproduced the whole forum via Dreamwidth, not just Violation, as Monsarrat acknowledges. Br. 14. Accordingly, "[t]hat the posts [through April 2017] remained accessible on LiveJournal has no bearing on the court's analysis." Add. 11 n. 4 (discussing defamation claim). The record makes evident a transformative purpose to maintain the Davis Square forum as a cohesive and continuing whole.

### c.    Bad faith conduct is not an element of the fair use analysis.

Monsarrat argues that "the fair use defense relies on outcome determinative factual conclusions as to, among others, the infringer's good faith," and that "Supreme Court and First Circuit precedent mandates that the fact finder assess 'the propriety of [Newman's] conduct' and whether in equity Newman acted in good faith." Br. 50,

58 (*quoting Harper & Row*, 471 U.S. at 562). It does not. Neither this Court nor the Supreme Court has required an inquiry into the fair user's good faith or conduct. The Supreme Court has expressed doubt that good faith has any place in the analysis at all.

The first factor entails an objective analysis into what "character may be reasonably perceived" in the work as used, not in its user. *Campbell*, 510 U.S. at 582. A user's "good faith" is not "central to fair use"; as Judge Leval explained, it is "irrelevant to fair use analysis." *Id*. at 585 n. 18 (*citing* Leval 1126-27). "No justification exists for adding a morality test." Leval 1126. "Plaintiff tries to conflate 'motive' with the purpose and character of the use, which is not permitted by the case law. … [I]t is the manner of use, not the motivation behind it, which must be analyzed: 'what use was made,' rather than 'who is the user.'" *Savage v. Council on Am.-Islamic Relations, Inc.*, No. C 07-6076 SI, 2008 U.S. Dist. LEXIS 60545, *12-13 (N.D. Cal. July 25, 2008) (*quoting* William F. Patry, *Patry on Fair Use* § 10.13).

Monsarrat notes that the Supreme Court once observed that "[f]air use presupposes good faith and fair dealing." Br. 49 (*citing Harper & Row*, 471 U.S. at 562). But that observation, derived from dictum in *Time Inc. v. Bernard Geis Associates*, 293 F. Supp. 130, 146

(S.D.N.Y. 1968), has "a noticeable absence of historical support." Simon J. Frankel & Matt Kellogg, *Bad Faith and Fair Use*, 60 J. Copyright Soc'y 1, 9-12, 16-19 (Fall 2012). Both Supreme Court fair use cases since *Harper & Row* have cast doubt on that observation. "[O]ur decision in *Campbell* expressed some skepticism about whether bad faith has any role in a fair use analysis." *Google*, 141 S. Ct. at 1204 (*citing Campbell*, 510 U.S. at 585 n. 18). "We find this skepticism justifiable, as '[c]opyright is not a privilege reserved for the well-behaved.'" *Id.* (*quoting* Leval 1126).

Monsarrat suggests that some relevant "bad faith" might be found because he also alleged defamation. Br. 53 (*citing* App. 1 ¶ 1). But pleadings that contain "no more than conclusions are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Those conclusory allegations are not plausible because the defamation claims failed, and not germane to a reproduction of his own Violation post because it did not defame him.

Moreover, "any negative impact must result from the alleged act of copyright infringement, not merely from a disparaging remark." *NAGE/Int'l Bhd. of Police Officers v. BUCI TV, Inc.*, 118 F. Supp. 2d 126, 129 (D. Mass. 2000) (finding fair use where defamation was also

23

alleged) (*citing New Era Publ'ns Int'l, ApS v. Carol Publ'g Grp*, 904 F.2d 152, 160 (2d Cir. 1990)). Monsarrat cites no fair use precedent that treats defamation allegations as pertinent to the user's copyright-related conduct. "The goals of patent and copyright law[] focus[] on the right of the individual to reap the reward of his endeavors and have little to do with protecting feelings or reputation." *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 573 (1977). Scathing criticism does not create "a harm cognizable under the Copyright Act" and reputational harms are not relevant under the fourth factor. *Campbell*, 510 U.S. at 591-92; *Google*, 141 S. Ct. at 1206; *Núñez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 24 (1st Cir. 2000) ("to the extent the copying damages a work's marketability by parodying it or criticizing it, the fair use finding is unaffected"); *Caner v. Autry*, 16 F. Supp. 3d 689, 713-14 (W.D. Va. 2014).

### d.  If Newman's conduct were considered it would have little weight and would support a finding of fair use.

Bad faith has little weight, if any. Courts that take conduct into account do not treat bad faith as "conclusive of the fair use question, or even of the first factor." *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs.*, 923 F. Supp. 1231, 1244 n. 14 (N.D. Cal. 1995). Even in such courts, "the bad faith of a defendant is not dispositive of a fair

use defense," and "while the good or bad faith of a defendant generally should be considered, it generally contributes little to fair use analysis." *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 479 & n.2 (2d Cir. 2004). *See Google*, 141 S. Ct. at 1204 ("given the strength of the other factors pointing toward fair use … that fact-bound consideration [of good faith] is not determinative in this context").

This Court, like most Circuit Courts, has not required consideration of the fair use claimant's conduct or "propriety." When one lower court did consider the issue and found that good faith weighed in favor of fair use, the First Circuit agreed and affirmed, where the copyrighted work was obtained lawfully, duly attributed, and previously published. *Núñez*, 235 F.3d at 23. The same indicia of good faith support the Dreamwidth use of Violation, as it was copied from LiveJournal and attributed to Monsarrat's username. App. 25.

The types of bad faith conduct that have been found pertinent to fair use are absent. "The [*Harper & Row*] good faith inquiry concerned how the original work was obtained, not the motive behind the use." *Savage*, 2008 U.S. Dist. LEXIS 60545, *13. Unlike the *Harper & Row* "purloined manuscript," 471 U.S. at 563, Violation was posted publicly on LiveJournal seven years before the copy on

Dreamwidth. App. 21-25, Br. 48. "The cases that have considered the defendant's bad faith tend to involve unauthorized use of an unpublished work or using a work for free when it could have been obtained for a fee." *Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.*, 553 F. Supp. 2d 680, 698 (N.D. Tex. 2008). Licensing fees were never at issue because Violation, like most social media posts, has "no market value" and "no plausible market." Br. 11-12, 57.

If Monsarrat's allegation that Newman "copied and published [Violation] as an integral part of [Newman's] defamatory statements" had been plausibly pleaded, App. 6 ¶ 1, despite the failure of the defamation claims, it would further support a finding of fair use. It effectively alleges that Newman's purpose was "criticism," which is exemplary of fair use under section 107's preamble. "[T]he critique and the copyrighted work serve 'fundamentally different functions, by virtue' of, among other things, 'their opposing viewpoints.'" *New Era*, 904 F.2d at 160 (*quoting Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1264 (2d Cir. 1986)). "[T]his criticism lies at the heart of what fair use seeks to protect." *Caner*, 16 F. Supp. 3d at 710.

> Many speakers who criticize others using copyrighted works may be motivated to do so based on dislike or distrust of the object of their criticism. If that were a barrier to free speech, fair use would offer little

protection, and the analysis would delve courts into a complex and highly subjective inquiry about the motivations and relationships between parties.

Instead, the analysis properly focuses on preventing the unscrupulous appropriation of another's work for personal profit.

*Id.* at 712.

Thus the Court need not consider and should not find bad faith. It may find good faith instead. And even a bad faith finding, given the limited weight it is accorded and Newman's entirely noncommercial and transformative purposes, would not tip the first factor scales. The purpose and character of the use strongly favors fair use.

## II.   The factual, informational nature of the post supports a finding of fair use.

The nature of Monsarrat's copyrighted work weighs in favor of fair use. 17 U.S.C. § 107(2). "This factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586; *see Google*, 141 S. Ct. at 1202. "The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy." *Harper & Row*, 471 U.S. at 563. Thus, "'the more informational or functional the plaintiff's work, the broader should be the scope of the

27

fair use defense.'" *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d
522, 531 (9th Cir. 2008) (*quoting 4 Nimmer on Copyright* §
13.05[A][2][a]). And "if a work has appeared on the Internet before a
defendant copies it, this strengthens a finding of fair use." *Bell v.
Moawad Grp., LLC*, 326 F. Supp. 3d 918, 927 (D. Ariz. 2018). "Courts
construe fair use protection broadly when the copyrighted material is
more informational than entertaining in nature, and when it has
already been released to the public." *NAGE*, 118 F. Supp. 2d at 129
(*citing Harper & Row*, 471 U.S. at 563-64).

Resolving this factor was not "premature." Br. 55, App. 82.
Courts can discern if copyrighted works "fall closer to the creative end
of the copyright spectrum than the informational or factual end" by
reading them. *Soc'y of the Holy Transfiguration Monastery, Inc. v.
Gregory*, 689 F.3d 29, 62 (1st Cir. 2012) (finding that translations
"reflected creativity, imagination, and originality in their language,
structure, word choice, and overall textual translation").

Violation's nature is evident. It is a brief comment in an online
neighborhood community forum in 2010, comprised of a link to and
quote from the abuse policy of the forum's then-host LiveJournal, and
four short declarative sentences demanding that other users remove

their posts or face an abuse report. Monsarrat contends that "'all letters are literary,'" but he identifies no particular "markers and indicia of a literary work" in Violation, and does not dispute that it "simply repeated the LiveJounal.com harassment policy and warned users to delete their posts[.]" Br. 55 (*quoting Folsom*, 9 F. Cas. at 346). It is primarily factual, functional, and informational, not a work of art, entertainment, fantasy, or imagination.

Monsarrat erroneously relies on the modicum of creativity required for a work to be original enough to be copyrightable, as if that alone satisfies the second factor. *Id.* (*citing Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991)). But this factor "refers to the 'nature' of the work beyond this initial inquiry." *Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 410 (5th Cir. 2004). "In making the determination as to a work's non-factual or creative component, the threshold is not so low as the 'originality' standard for copyrightability (*i.e.* the 'minimal creative spark' requirement from *Feist*…)." *Mathieson v. Associated Press*, No. 90 Civ. 6945, 1992 U.S. Dist. LEXIS 9269, *16-17 (S.D.N.Y. June 25, 1992).

Violation, like the "functional in nature" declaring code at issue in *Google*, "is, if copyrightable at all, further than are most [works]

from the core of copyright." 141 S. Ct. at 1202. Its content was wholly dictated "by the functional considerations inherent in conveying the desired information[.]" *Murray Hill Publ'ns, Inc. v. ABC Commc'ns, Inc.*, 264 F.3d 622, 633 (6th Cir. 2001).

Even if Violation included some unspecified creative element, its informational and previously disseminated nature weighs in favor of fair use. *See Marano*, 844 Fed. Appx. at 439; *Bell*, 326 F. Supp. 3d at 927; *In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d 875, 885 (C.D. Cal. 2020). Fair use is well supported on this factor.

## III.   The amount of the use was reasonable to serve its purpose and supports a finding of fair use.

The third factor favors fair use because "the amount and substantiality of the portion used," 17 U.S.C. § 107(3), was reasonably necessary to serve the purpose of preserving the historical record.

Ordinarily copying an entire work "militat[es] against a finding of fair use." *Sony*, 464 U.S. at 450. But the third factor "inquiry must be a flexible one, rather than a simple determination of the percentage used." *Núñez*, 235 F.3d at 24. "[T]he enquiry will harken back to the first of the statutory factors, for … the extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586-87. And verbatim reproduction is

permissible for transformative purposes. "[A] secondary work 'can be transformative in function or purpose without altering or actually adding to the original work.'" *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg, L.P.*, 756 F.3d 73, 84 (2d Cir. 2014) (*quoting A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009)). It is widely accepted that "making an exact copy of a work may be transformative so long as the copy serves a different function from the original work." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1166 (9th Cir. 2007). For instance, "the Met's copying the entirety of [a photograph was] necessary to make a fair use of the image as one of many historical artifacts in the exhibition." *Marano*, 844 Fed. Appx. at 439. And a newspaper copying unaltered photographs with transformative "news purposes" did not weigh against fair use when "to copy any less than that would have made the picture useless to the story." *Núñez*, 235 F.3d at 22-23.

As the District Court found, the amount copied was tied to valid transformative ends: "Newman copied Monsarrat's post in full, but a full reproduction is consistent with historical and preservationist purposes." Add. 7. "If a communication is sufficiently brief, any quotation will necessarily take most or all of it." Leval 1123.

31

Reproducing any less of Violation would have undermined the archival purpose to fully preserve the forum posts.

Newman originally argued, and the District Court found, that the third factor was neutral. App. 40, Add. 7. The Supreme Court has since clarified that "[t]he 'substantiality' factor will generally weigh *in favor of* fair use where, as here, the amount of copying was tethered to a valid, and transformative, purpose." *Google*, 141 S. Ct. at 1205 (emphasis added). *Accord Blanch v. Koons*, 467 F.3d 244, 258 (2d Cir. 2006); *Sundeman*, 142 F.3d at 206; *New Era*, 904 F.2d at 159.

Accordingly, under *Google*, the third factor favors fair use, and cannot weigh against it. At worst it can be found neutral. Newman's transformative purpose and Monsarrat's lack of market harm mitigate any weight the verbatim copy could have against fair use.

## IV. The absence of any harmful market effect strongly supports a finding of fair use.

The fourth factor strongly supports fair use. No market for Violation is alleged, apparent, or plausible, and a noncommercial copy of an unmarketable post causes no cognizable copyright injury.

## a. Monsarrat fails to show any market harm.

Monsarrat does not dispute that the use is noncommercial and he fails to meet his burden to substantiate market harm.

Noncommercial uses are presumptively fair. *Sony*, 464 U.S. at 449. For such use, the burden of proof under the fourth factor shifts to the plaintiff. "A challenge to a noncommercial use of a copyrighted work requires proof either that the particular use is harmful, or that if it should become widespread, it would adversely affect the potential market for the copyrighted work." *Id.* at 451. "What is necessary is a showing by a preponderance of the evidence that *some* meaningful likelihood of future harm exists." *Id.* "[I]f it is for a noncommercial purpose, the likelihood must be demonstrated." *Id.*; *accord Campbell*, 510 U.S. at 591; *Rubin v. Brooks/Cole Publ'g Co.*, 836 F. Supp. 909, 920 (D. Mass. 1993). "There is no presumption that a market exists for the copyrighted work. Instead, the existence of a market and potential harm to that market must be alleged and proven." *Patry on Fair Use* § 6.6.

Monsarrat disavows his burden. He "does not allege any economic harm attributable to" the alleged infringement. Br. 18. And he concedes "[t]hat there is no plausible market" for Violation. Br. 57.

When a plaintiff fails to show market harm, "the apparent noncommercial nature of the [] use 'weighs heavily against [his] infringement claim' with respect to that use.'" *Bouchat*, 619 F.3d at

33

314 (*quoting Bond v. Blum*, 317 F.3d 385, 395 (4th Cir. 2003)). The concession that the use "did not interfere with any potential market for [the work] or for derivative works based upon it" resolves the fourth factor in favor of fair use. *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 116 (2d Cir. 1998); *see id.* n. 6 (when plaintiff "has not identified any market for a derivative work that might be harmed by" the use, "the defendant had no obligation to present evidence showing lack of harm in a market for derivative works").

"Where no market exists for a copyrighted work because the copyright holder '[n]ever tried to sell' it, the fourth factor favors fair use." *Bassett v. Jensen*, 459 F. Supp. 3d 293, 307 (D. Mass. 2020) (*quoting Núñez*, 235 F.3d at 25); *accord Katz*, 802 F.3d at 1184 ("Due to Katz's attempt to utilize copyright as an instrument of censorship against unwanted criticism, there is no potential market for his work."). Reusing a work with "no market or intrinsic value" has no potential market effect and favors a finding of fair use. *Ascend Health Corp.*, 2013 U.S. Dist. LEXIS 35237, *45; *accord Denison v. Larkin*, 64 F. Supp. 3d 1127, 1135 (N.D. Ill. 2014) ("Plaintiff has not identified any market for or revenue generated from the Blog" posts).

**b.    Any non-economic value of Monsarrat's copyright does not affect the fourth-factor analysis.**

Monsarrat emphasizes that the statute frames the fourth factor as "the effect of the use upon the potential market for or value of the copyrighted work," 17 U.S.C. § 107(4). Br. 56, App. 83. That formulation did not expand the analysis to encompass non-economic considerations, because "Congress meant § 107 'to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way.'" *Campbell*, 510 U.S. at 577 (*quoting* H.R. Rep. No. 94-1476, p. 66); *Harper & Row*, 471 U.S. at 549, 554 (same); *Authors Guild*, 804 F.3d at 213 ("Congress had no intention of normatively dictating fair use policy") (Leval, J.). Section 107 recognizes, but does not control, the evolving doctrine. Congress had "no disposition to freeze the doctrine in the statute." H.R. Rep. No. 94-1476, p. 66. Courts should not "focus on the word-bites of the statute instead of the fair use doctrine itself." *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1284 (11th Cir. 2014) (Vinson, J., concurring).

Only market effects are material to the fourth factor. "There are many ways in which the unauthorized use of a copyrighted work may damage its value. Not all of them are relevant to the issue of fair use." William F. Patry and Shira Perlmutter, *Fair Use Misconstrued:*

*Profit, Presumptions, and Parody*, 11 Cardozo Arts & L.J. 667, 692 (1993). Monsarrat cites dicta in *Gregory*, Br. 58, which recited the "value of the copyrighted work" clause for the proposition that "the Copyright Act looks beyond monetary or commercial value and considers other forms of compensation for a work." 689 F.3d at 64. Yet *Gregory* ultimately gave weight only to market effects under this factor: that finding fair use would "affect the market for translations of ancient religious texts," and that "'unrestricted and widespread' copying … would have an 'adverse impact on the potential market for the original' Works." *Id.* (*quoting Campbell*, 510 U.S. at 590).

Both the "market for" and the "value of" a copyrighted work are economic considerations. The inquiry into the "market for" the work concerns market substitution. "[T]his factor is 'concerned with secondary uses that by offering a substitute for the original, usurp a market that properly belongs to the copyright holder.'" *Núñez*, 235 F.3d at 24 (*quoting Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 110 (2d Cir. 1998)); *accord Gregory*, 689 F.3d at 64 (*quoting Núñez* at 24). The "value of" the work under the fourth factor concerns other copyright-related effects on copyright holders, such as those who choose to make their works available cheaply or freely, as loss leaders

36

or to market other products. *See Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191, 202 (3d Cir. 2003). Either way, "[w]ith respect to the fourth factor—the effect of the use on the *value* of the copyrighted material—the relevant question is whether the infringement impacted the *market* for the copyrighted work itself." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 544 (6th Cir. 2004) (emphasis added). *See also Google*, 141 S. Ct. at 1206-08; *Campbell*, 510 U.S. at 590-94; *Harper & Row*, 471 U.S. at 544; *Rubin*, 645 F.2d at 84.

The non-economic value that Monsarrat ascribes to Violation cannot avoid a fair use finding. He claims a "property right" to sue over reproduction: the "exclusive right" that section 106 grants to copyright holders, which holds "value to him … independent of any potential market value." Br. 57, DE 40 p. 8, App. 83. But that right is not absolute. "Copyright protection … has never accorded the copyright owner complete control over all possible uses of his work." *Sony*, 464 U.S. at 432. "Any individual may reproduce a copyrighted work for a 'fair use'; the copyright owner does not possess the exclusive right to such a use." *Id.* at 433. The "exclusive rights in copyrighted works" provided by section 106 are expressly subject to

37

specific limitations, first and foremost "the right of fair use as provided by section 107[.]" 17 U.S.C. § 108(f)(2). The property rights of copyright holders "are subservient to the speech rights of fair users." Ned Snow, *Fair Use as a Matter of Law*, 89 Denv. U.L. Rev. 1, 33 (2011). If the "value" of merely owning a copyright tipped the fourth factor in a plaintiff's favor it would swallow the factor whole, and "the impact on market values would be irrelevant; any unauthorized taking would be obnoxious." Leval 1124.

Monsarrat further asserts that "the value [of the right] to preclude the use of his copyright to defame him[] tilts the fourth factor in his favor." Br. 58. That "value" has no weight in the analysis because disseminating his own words did not defame him, and because defamation is not a copyright harm. *See NAGE*, 118 F. Supp. 2d at 129; *Katz*, 802 F.3d at 1184; *Peterman v. Republican Nat'l Comm.*, 369 F. Supp. 3d 1053, 1065 (D. Mont. 2019) ("the Copyright Act does not exist to protect artists' general reputations").

The statute confirms that the fourth factor concerns economic effects, not the value Monsarrat claims in his "exclusive rights" under section 106. When Congress wants to address the latter sort of "value," it says so. *See* 17 U.S.C. § 112(e)(8) ("Nothing in this

subsection … affects in any way the existence or *value of any of the exclusive rights* of the copyright owners in a sound recording … or in a musical work, including the exclusive rights to reproduce and distribute…") (emphasis added). Elsewhere in the Copyright Act, wording similar to that in section 107(4) addresses market values. When a "restored work" is infringed, *see* 17 U.S.C. § 104A(h)(6), the amount of "harm to the actual or potential market for or value of the restored work" is an economic question resolved in an action to determine the "compensation" due. 17 U.S.C. § 104A(d)(3)(B).

Thus, the fourth factor concerns economic effects on a relevant copyright market. Monsarrat cannot show any because Violation is unmarketable. His "exclusive rights" do not alter the analysis. This factor strongly supports a finding of fair use.

## V.  The relevant factors in tandem strongly support a finding of fair use.

All four factors are "weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578. Together, all relevant considerations strongly favor a finding of fair use.

Newman maintained a record of Monsarrat's threat to forum users when LiveJournal's policy changes posed further threats to free expression. The noncommercial use had the distinct, transformative

39

purpose to keep the forum's history intact. It took a factual and declaratory statement, used no more than necessary, and had no conceivable market effect. Finding infringement of his bare right to sue would not serve the purposes of copyright. "[A] use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create." *Sony*, 464 U.S. at 450. All four factors strongly support fair use, with the only possible exception the third factor, which does not weigh against it.

The four factors are "not exhaustive." *Google*, 141 S. Ct. at 1197. Accordingly, it also proper to consider Monsarrat's ulterior purposes in raising a copyright claim as "a gratuitous frill" to get into federal court. DE 41 p. 3. The District Court found it "obvious" that "Monsarrat was free at any time to remove [Violation] from the Dreamwidth website, with or without Newman's permission." *Id.* Monsarrat, like any LiveJournal user, can manage and delete comments imported to Dreamwidth under his username by entering his LiveJournal account URL at https://www.dreamwidth.org/openid and confirming his LiveJournal login information. He sued instead of exercising self-help. He did not send Dreamwidth a DMCA takedown

notice pursuant to 17 U.S.C. § 512(c)(3), though he has used that procedure elsewhere. DE 34 p. 11. His pre-suit demand letter addressed only defamation, not copyright. DE 40-2 pp. 2-7. *See generally Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 602 (9th Cir. 2018) (noting plaintiff "did not send DMCA notices or any other sort of takedown notice … [or] remove the material itself" before filing suit). "The copyright owner, not the service provider, has the burden of policing infringement." *Id.* at 604. Monsarrat sought to capitalize on the use, not prevent it. His FAC pursued only pecuniary remedies, not injunctive relief. App. 14-16 ¶¶ 42-43, 48, Prayer for Relief. "Asserting copyright to suppress information, erase facts, and censor criticism is detrimental to free speech and public discourse, and contrary to the purpose of copyright law to encourage the dissemination of information." Cathay Y.N. Smith, *Copyright Silencing*, 106 Cornell L. Rev. Online 71, 78 (2021).

This is a hallmark instance of fair use, not infringement. The copyright claim was properly dismissed.

## B.    The copyright dismissal should also be affirmed because Monsarrat claims no redressable injury.

Dismissing the copyright claim was also appropriate because Monsarrat is not entitled to any relief requested. *See Doe v.*

*Backpage.com, LLC*, 817 F.3d 12, 28-29 (1st Cir. 2016) (affirming

dismissal of copyright claim that identified "no redressable injury").

17 U.S.C. § 412 precludes any statutory damages because any

infringement commenced before the copyright was registered.

> By reason of § 412, in order for a copyright owner to be
> entitled to recover statutory damages and attorney's fees,
> the work must have been registered prior to
> commencement of the infringement for which such
> remedies are sought. "Commencement" of the
> infringement means "the time when the first act of
> infringement in a series of ongoing discrete infringements
> occur."

> *Peer Int'l Corp. v. Latin Am. Music Corp.*, 161 F. Supp. 2d 38,

46-47 (D.P.R. 2001) (*quoting* 2 *Nimmer on Copyright* § 7.16[C][1]).

Downstream infringers are not subject to statutory damages

when any infringement commenced before registration. "By its terms,

§ 412 imposes a bar to recovering statutory damages if a defendant

can show that any infringement began before the registration of the

works in question." *Sullivan v. Flora, Inc.*, 936 F.3d 562, 572 (7th Cir.

2019). "[I]t is appropriate to treat the earliest date of infringement by

*any* participant in a line of related copyright violations as the date of

commencement." *Bouchat v. Bon-Ton Dep't Stores, Inc.*, 506 F.3d

315, 331 (4th Cir. 2007); *accord Love v. New York City*, No. 88 Civ.

7562, 1989 U.S. Dist. LEXIS 13740, *4 (S.D.N.Y. Nov. 20, 1989)

(section 412 would apply to "sale of an infringing book by one book store before registration and sale of the same book by another after registration"); *Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 699-700 (9th Cir. 2008) ("17 U.S.C. § 412(2) leaves no room for discretion.").

Principles of *res judicata* prevent Monsarrat from denying that the alleged infringement commenced before Violation's copyright registration issued on August 16, 2012. Br. 48. He posted it in the Davis Square forum on February 6, 2010. App. 22, Br. 13, 22. He obtained judgment in *Rosenbaum* upon allegations of infringements on EncyclopediaDramatica.com, of Violation and other works, before January 19, 2011. *Monsarrat v. Rosenbaum*, Order of Default Judgment; *see id.*, Complaint ¶¶ 9(h), 16 (D. Mass. filed Feb. 15, 2011), https://lumendatabase.org/notices/1698000#. His FAC alleged a continuing chain of infringing acts that trace back to that site. App. 8-15 ¶¶ 8-10, 13-15, 21, 26-27, 31-34, 44-45; *see* DE 13. Pursuant to section 412, the alleged infringement commenced in or before 2011, pre-registration, and statutory damages are barred.

Any award of actual damages or profits is also precluded. A "copyright owner may elect, at any time before final judgment is

rendered, to recover, instead of actual damages and profits, an award of statutory damages[.]" 17 U.S.C. § 504(c)(1). Monsarrat elected statutory damages in the FAC. App. 16 ¶ 48, Prayer for Relief. That election of remedies is binding; "once a plaintiff elects statutory damages he may no longer seek actual damages." *Latin Am. Music Co. v. Spanish Broad. Sys., Inc.*, 866 F. Supp. 780, 782 (S.D.N.Y. 1994); *see Fischer v. Forrest*, 968 F.3d 216, 220-22 (2d Cir. 2020).

Even if not precluded, actual damages and profits are not recoverable because none exist. Monsarrat does not dispute that Violation has "no market value" and accepts that it has "no plausible market." Br. 12, 57; Add. 8. He neither denied that the use was noncommercial nor alleged that Newman profited. Br. 52-53, App. 16. "No facts set forth in the [FAC] suggest that the market value ... has been affected in any way by the infringement, and [Monsarrat] points to nothing that might plausibly support such an inference." *Backpage.com*, 817 F.3d at 28. "By the same token, nothing in the complaint plausibly suggests a basis for a finding that [Monsarrat] would be entitled to profits attributable to the infringement." *Id.*

"'Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold

defendants accountable for legal infractions.'" *TransUnion LLC v.*

*Ramirez*, 141 S. Ct. 2190, 2205, 210 L. Ed. 2d 568 (2021) (*quoting*

*Casillas v. Madison Ave. Assocs.*, 926 F.3d 329, 332 (7th Cir. 2019)

(Barrett, J.)). Monsarrat has no redressable copyright injury in fact.

The dismissal must be affirmed.

## C.     The Court should affirm the dismissal of the defamation claim because Section 230 immunizes the republication of comments by other users.

Section 230 grants a "broad immunity" to online entities and

users who "facilitate the speech of others on the Internet." *Univ.*

*Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 415 (1st Cir. 2007).

Newman facilitated the speech of Davis Square forum users by

reproducing the forum's contents via Dreamwidth once that content

was "no longer welcome on LiveJournal." App. 10 ¶¶ 19-20. Because

Monsarrat's defamation claims attack that facilitation, they fall within

the immunity provided by Section 230 and were properly dismissed.

Section 230 immunity is vital to modern discourse because it

"prevent[s] lawsuits from shutting down websites." *Batzel v. Smith*,

333 F.3d 1018, 1028 (9th Cir. 2003). Without it, "[t]he specter of tort

liability in an area of such prolific speech would have an obvious

chilling effect." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir.

1997)). In light of these policy concerns, "Section 230 immunity should be broadly construed." *Lycos*, 478 F.3d at 419. "There has been near-universal agreement that section 230 should not be construed grudgingly." *Backpage.com*, 817 F.3d at 18. Courts routinely apply Section 230 at the Rule 12(b)(6) stage. *See id.* at 15; *Small Justice*, 873 F.3d at 321; *Lycos*, 478 F.3d at 417.

The statute provides: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). So Section 230 precludes a state law claim when three criteria are met: "(1) [the defendant] is a 'provider or user of an interactive computer service'; (2) the claim is based on 'information provided by another information content provider'; and (3) the claim would treat [the defendant] 'as the publisher or speaker' of that information." *Lycos*, 478 F.3d at 418 (*quoting* 47 U.S.C. § 230(c)(1)).

## I.    Section 230 bars Monsarrat's defamation claims.

Because each element is satisfied, Section 230 immunity applies by its express terms and bars Monsarrat's defamation claims.

(1)    Monsarrat acknowledges that Newman was a LiveJournal user and is a Dreamwidth user, and that both hosts are "interactive

computer services." Br. 13, 14, 17, 32; App. 8-10 ¶¶ 8-9, 18, 20; *see* 47 U.S.C. § 230(f)(2).

(2)     Monsarrat recognizes that third parties wrote and posted the allegedly defamatory posts in the Davis Square forum. Br. 26, 42-43 ("Newman ... had not created or authored any of the defamatory statements"), App. 76 ("Newman did not originally write or compose any of the original defamatory statements."). He asserts that Newman was an information content provider. Br. 26, 39, 44; App. 11 ¶ 25. Yet he "explicitly acknowledges that Newman was not the content provider of the original [allegedly] defamatory LiveJournal posts." App. 121. Thus, each third-party author was "*another* information content provider" under the statute, that is: "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). The defamation claims are based on information that those other "content providers" provided. Br. 13-14.

(3)     Monsarrat "indisputably seeks to treat Newman as the publisher of the cited statements." Add. 9-10; *see* Br. 14 ("Newman published ... the defamatory posts, the wording of which had been

both created and then originally published on the LiveJournal.com website by the original anonymous LiveJournal.com website content providers"). He claims that Newman "took ownership of" that content and "made it his own" by reproducing it. App. 11 ¶ 23, Br. 39. Alleging that those posts became Newman's own once on Dreamwidth, *see* App. 10-13 ¶¶ 20-25, 33(i), treats him "as the publisher or speaker of information provided by another information content provider" under 47 U.S.C. § 230(c)(1).

## II.  Monsarrat fails to plead around Section 230.

None of Monsarrat's arguments sustain his defamation claims.

### a.  Monsarrat treats Newman as a publisher within the meaning of Section 230.

Monsarrat asks the Court to construe the phrase "treat as a publisher" in Section 230. Br. 34. The Court has already provided its construction, derived from *Zeran*:

> Section 230(c) … shields website operators from being "treated as the publisher or speaker" of material posted by users of the site, 47 U.S.C. § 230(c)(1), which means that "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred."
>
> *Backpage.com*, 817 F.3d at 18 (*quoting Zeran*, 129 F.3d at 330);

*accord Lycos*, 478 F.3d at 422 (*quoting Zeran*, 129 F.3d at 330).

Though Monsarrat silently omits "publish" when he quotes "deciding whether to publish," he recognizes that *Zeran* supplies the phrase's typical construction. Br. 35-36.

Yet such traditional editorial decisions are precisely what he assails. He asserts that Newman "determined to republish" Davis Square forum posts from LiveJournal when reconstituting the forum on Dreamwidth. Br. 10; *see* App. 78 (Newman "copied them and then decided to post them on Dreamwidth"). He faults Newman for acting "as a publisher in his own right" of statements that third parties had "created and then posted." Br. 47. In Monsarrat's view, Newman

> is cast in the same position as the part[ies] who originally posted the offensive messages. According to [Monsarrat's] logic, [Newman] is legally at fault because [he] communicated to third parties an allegedly defamatory statement. This is precisely the theory under which the original poster of the offensive messages would be found liable.

*Zeran*, 129 F.3d at 333. Monsarrat "seeks to impose liability on [Newman] for assuming the role for which § 230 specifically proscribes liability—the publisher role." *Id*. at 332-33.

The CDA forecloses that theory of liability. "If the cause of action is one that would treat the service provider as the publisher of a particular posting, immunity applies not only for the service

49

provider's decisions with respect to that posting, but also for its inherent decisions about how to treat postings generally." *Lycos*, 478 F.3d at 422. The Davis Square moderators determined that new LiveJournal policies endangered the forum and that all posts should be carried over when the forum continued via Dreamwidth. Such website moderation decisions about how to treat all posts generally are traditional editorial functions, and "Section 230 immunity does not depend on the form that decision takes." *Id.*

Monsarrat erroneously suggests that Section 230 protects only "passive activity" by "neutral" "intermediaries." Br. 20, 35, 37, 39, 42. Those terms are absent from Section 230, which expressly protects not only providers but also everyday users of interactive computer services. The theory that "those who actively post or republish information on the Internet are 'information content providers' unprotected by the statutory immunity" has been roundly rejected. *Barrett v. Rosenthal*, 40 Cal. 4th 33, 60 (Cal. 2006). Section 230 "provid[es] immunity even where the interactive service provider has an active, even aggressive role in making available content prepared by others[.]" *Blumenthal v. Drudge*, 992 F. Supp. 44, 52 (D.D.C. 1998). "As multiple courts have accepted, there is no relevant

distinction between a user who knowingly allows content to be posted to a website he or she controls and a user who takes affirmative steps to republish another person's content; CDA immunity applies to both." *Charles Novins, Esq., P.C. v. Cannon*, Civ. No. 09-5354, 2010 U.S. Dist. LEXIS 41147, *7 (D.N.J. Apr. 27, 2010), *aff'd on other grounds*, 557 Fed. Appx. 155 (3d Cir. 2014). The statute invites *active* editorial functions by moderators: in addition to the general immunity available under Section 230(c)(1), it provides a specific immunity for good-faith restrictions under Section 230(c)(2). *See Backpage.com*, 817 F.3d at 18.

Monsarrat misapplies the Ninth Circuit's "material contribution" test for assessing the "development of … information" under 47 U.S.C. § 230(f)(3). Br. 22, 37-38, 43-46. The case that articulated that test found that "[t]he CDA does not grant immunity for inducing third parties" to create illegal content. *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1165 (9th Cir. 2008). But inducement is not alleged, and not a basis for liability in this Circuit, where "[i]t is not at all certain that there is a culpable assistance exception to Section 230 immunity." *Lycos*, 478 F.3d at 421 ("active inducement" not sufficiently alleged).

Where recognized, the material contribution test "draw[s] the line at the 'crucial distinction between, on the one hand, taking actions (traditional to publishers) … [to display] actionable content and, on the other hand, responsibility for what makes the displayed content illegal or actionable.'" *Kimzey v. Yelp!, Inc.*, 836 F.3d 1263, 1269 n. 4 (9th Cir. 2016) (*quoting Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 409 (6th Cir. 2014). Newman merely copied forum comments to Dreamwidth in 2017. He cannot be responsible for making any of them defamatory, because Monsarrat alleged that they were already defamatory the first time he sued Newman in 2013. App. 8-9 ¶¶ 8-12.

Changing the forum's host "did not alter the content of the information [the original authors] posted such that [Newman] could be said to have been 'responsible for … creat[ing] or develop[ing]' that content by reason of having actually authored it, whether in whole or in part." *Small Justice*, 873 F.3d at 322. And "making information more available is … an essential part of traditional publishing; it does not amount to 'developing' that information within the meaning of Section 230." *Force v. Facebook, Inc.*, 934 F.3d 53, 70 (2d Cir. 2019).

**b.  Republication is within Section 230's broad immunity.**

Republication is within Section 230 immunity. Monsarrat cites
no case that, despite Section 230, imposed defamation liability on a
website provider or user for republishing third-party comments.

"Congress intended to create a blanket immunity from tort
liability for online republication of third party content." *Barrett*, 40
Cal. 4th at 57. "[T]he CDA does not allow liability against the
defendants on the theory that they adopted the third party's
statements by consciously—or unconsciously—deciding to re-post
them on other sites." *Doe v. Friendfinder Network, Inc.*, 540 F. Supp.
2d 288, 298 n. 10 (D.N.H. 2008) (*citing Chicago Lawyers' Comm.
for Civ. Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666,
2008 WL 681168, *4 (7th Cir. 2008)). "Republishing an already-
existing user-submitted comment, without altering the content of that
comment, does not materially contribute to its allegedly defamatory
nature." *Ayyadurai v. Floor 64, Inc.*, 270 F. Supp. 3d 343, 368 (D.
Mass. 2017). Courts applying the material contribution test have also
"found that 'merely taking action that is necessary to the display of
allegedly illegal content,' including republishing and commenting
upon user generated content, does not constitute 'creation or

development.'" *Id.* (*quoting Jones*, 755 F.3d at 410); *see Small Justice*, 873 F.3d at 322 (*quoting Ayyadurai* at 368).

Reproducing existing content from one website to another is not the "creation or development" of that content under 47 U.S.C. § 230(f)(3) because it was already created and developed by third parties. The original posters were "the source of the allegedly injurious matter" in their posts, so Newman "cannot be held liable for 're-posting' the [posts] elsewhere without impermissibly treating [him] as 'the publisher or speaker of information provided by another information content provider.'" *Friendfinder*, 540 F. Supp. 2d at 295 (*quoting* 47 U.S.C. § 230(c)(1)). The CDA fully protects "the mere repetition of data obtained from another source." *Id.* at 296.

Courts consistently find that Section 230 immunity covers republications onto different websites. Reposting user comments from pissedconsumer.com onto Twitter was immunized "because the underlying information was provided by a third party." *Roca Labs, Inc. v. Consumer Op. Corp.*, 140 F. Supp. 3d 1311, 1320 (M.D. Fla. 2015). Facebook users were "absolutely privileged under the CDA" to republish information found on Instagram and Reddit. *Comyack v. Giannella*, No. SOM L 1356-19, 2020 N.J. Super. LEXIS 49, *7-11,

*114-118 (N.J. Super. Ct. Apr. 21, 2020). And website operators were immune from claims based on "'reposting,' on one or more websites, the inaccurate information originally published" on Indiana's sex offender registry website, without alteration. *Nail v. Schrauben*, No. 1:15-cv-177, 2016 U.S. Dist. LEXIS 17987, *4-5, *9-10 (W.D. Mich. Jan. 22, 2016), *adopted*, 2016 U.S. Dist. LEXIS 17394 (Feb. 12, 2016).

Courts in the Ninth Circuit reach the same result under the material contribution test. "We have made clear that republishing or disseminating third party content 'in essentially the same format' 'does not equal creation or development of content.'" *Fyk v. Facebook, Inc.*, 808 Fed. Appx. 597, 598 (9th Cir. 2020) (*quoting Kimzey*, 836 F.3d at 1270-71). So Facebook's alleged "re-publication" of web pages was immunized where the plaintiff failed to "identify how Facebook materially contributed to the *content* of the pages." *Id.* (emphasis added). When the recipient of an allegedly defamatory email posted its contents on a listserv he administered and a website he moderated, the "sole content provider" liable for the email was its author, and the "choice to publish" it on the listserv did not "rise to the level of 'development.'" *Batzel*, 333 F.3d at 1031. Section 230 also immunized Ancestry.com's republishing content from "decades-old

yearbook records." *Callahan v. Ancestry.com, Inc.*, No. 20-cv-08437-LB, 2021 U.S. Dist. LEXIS 112036, *1 (N.D. Cal. June 15, 2021). Even if it "obtained the information by scraping it from websites or copying it from libraries … Ancestry obviously did not create the yearbooks. Instead, it necessarily used information provided by another information-content provider and is immune." *Id.* *14.

Monsarrat recognizes that "attempts to plead around Section 230 … were rejected" in *Kimzey*, a Ninth Circuit republication case he calls inapposite but fails to distinguish. Br. 47. Kimzey "alleged that Yelp in effect created and developed content" by "causing a review from another site to appear on its page." 836 F. Supp. 3d at 1265-66. Such claims, without plausible allegations that the defendant "authored or created the *content* of the statements … are insufficient to avoid immunity under the CDA." *Id.* at 1268.

Like Monsarrat, Kimzey also alleged republications on another website: that "Yelp 'republishe[d]' the statements on Google as 'newly developed advertisements,' and in that fashion became the actual author of that iteration of the content." *Id.* at 1269; *see id.* at 1270 n.5 (construing claim that "Yelp proactively posted [user-generated content] on Google"). Those allegations of "downstream distribution"

changed nothing, because "Yelp is not liable for disseminating the same content in essentially the same format to [Google], as this action does not change the origin of the third-party content." *Id.* at 1270; *see Small Justice*, 873 F.3d at 322 (*quoting Kimzey* at 1270). "Nothing in the text of the CDA indicates that immunity turns on how many times an interactive computer service publishes 'information provided by another information content provider.'" *Id.* "Simply put, dissemination and proliferation of content does not equal creation or development of content." *Id.* at 1271. So "Newman's conduct as a user of the Dreamwidth website republishing statements originally posted on another website" must be immunized as well. App. 73.

Monsarrat considers it "immaterial" that Newman was not the original author of any allegedly defamatory content. Br. 21, 26; App. 76. But it is decisive. "Section 230 immunity depends on the source of the information in the injurious statement, not on the source of the statement itself." *Friendfinder*, 540 F. Supp. 2d at 295. "In short, immunity under the CDA depends on the pedigree of the content at issue." *Jones*, 755 F.3d at 409. Monsarrat concedes that the LiveJournal users who posted "the original anonymous defamatory statements" were "the persons responsible for what made their

individual statements unlawful[.]" App. 72. Section 230 precludes

attributing their words to Newman to hold him liable for their

content.

## Conclusion

Monsarrat has no potentially meritorious claims and no

grounds for reversal. The Court should affirm the dismissal in full.

Respectfully Submitted,

Ron Newman, Appellee,
by his attorney,

DATED: August 23, 2021          */s/ Dan Booth*
                                 Dan Booth
                                 Dan Booth Law LLC
                                 60 Thoreau Street #121
                                 Concord, MA 01742
                                 (646) 573-6596

## Certificate of Compliance

I, the attorney for Appellee Ron Newman, certify that this brief complies with Fed. R. App. P. 32(a)(7)(B) because it contains 12,022 words, excluding the items exempted by Fed. R. App. P. 32(f) and including the 118 words in the Violation post exhibited on page 3; and that its 14-point type size and Georgia typeface comply with Fed. R. App. P. 32(a)(5) and (6).

*s/ Dan Booth*
Dan Booth

## Certificate of Service

I certify that I electronically filed this Appellee Ron Newman's Answering Brief with the United States Court of Appeals for the First Circuit via the Court's CM/ECF system on August 23, 2021, and that service will be made on counsel of record for Appellant Jonathan Monsarrat via e-mail/ECF Notice.

*s/ Dan Booth*
Dan Booth